## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

SAMIRA LILIC,

                            Plaintiff,

       v.                                   6:14-CV-1420
                                                  (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

_____

DAVID A. EGHIGIAN, ESQ., for Plaintiff
TOMASINA DIGRIGOLI, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On February 7, 2011, plaintiff "protectively filed"[1] applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging disability, beginning October 31, 2010, due to chronic migraine headaches and nervous condition/stress. (Administrative Transcript ("T.") 21, 81-82, 186-89, 205, 209). The applications were initially denied on August 8,

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

2011.  (T. 21, 81-82, 90-101).  On November 8, 2012, Administrative Law Judge ("ALJ") Barry E. Ryan commenced a hearing at which plaintiff, who emigrated from the former Yugoslavia in 2000, was assisted by a non-attorney representative, and started to testify with the aid of a translator.  The hearing was adjourned because the plaintiff "repeatedly got up from her chair and strode around the hearing room, as if in a trance."  (T. 21, 68-80).  The hearing was continued on March 28, 2013, and the plaintiff testified at greater length through a translator; but, in the opinion of the ALJ, plaintiff again "engaged in bizarre behavior."  (T. 21, 42-67).  On April 24, 2013, ALJ Ryan issued a decision finding that plaintiff not disabled (T. 21-35), which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 25, 2014 (T. 1-6).

## II.  GENERALLY APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

2

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the Commissioner
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an
> impairment which meets or equals the criteria of an impairment listed in
> Appendix 1 of the regulations.  If the claimant has such an impairment,
> the Commissioner  will consider him [per se] disabled . . . . Assuming the
> claimant does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work.  Finally, if the claimant is unable to
> perform his past work, the Commissioner then determines whether there is
> other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697

F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has

the burden of establishing disability at the first four steps.  However, if the plaintiff

establishes that her impairment prevents her from performing her past work, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir.

2009) (clarifying that the burden shift to the Commissioner at step five is limited, and

the Commissioner "need not provide additional evidence of the claimant's residual

functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

4

## III. FACTS

Plaintiff was born in in 1982 in Sarajevo, Yugoslavia (now Bosnia and Herzegovina), where she completed high school. (T. 48-49, 73-74, 498). She moved to the United States in 2000, with some of her family, to escape from the horrors of the Bosnian War. (T. 498). Plaintiff worked as a machine operator for various employers between 2000 and 2010, learning at least some English on the job. (T. 50, 74, 192-94, 202). At some point during that time period, she successfully completed the process to become a naturalized citizen. (T. 50-51). Since the Fall of 2010, plaintiff, her husband, and their young son have lived in Utica, New York, having moved from Missouri after plaintiff left her last job as a sewing machine operator, purportedly for health reasons. (T. 52-53, 73-75, 439).

Plaintiff's brief has summarized the medical and other evidence. (Pl.'s Brief at 2-5, Dkt. No. 14). ALJ Ryan also discussed, at length, the evidence of record in his decision. (T. 21, 24-33). The Commissioner has incorporated, by reference, the facts alleged in plaintiff's brief and in the ALJ's opinion. (Def.'s Brief at 2, Dkt. No. 18). The court will further discuss the relevant medical and other evidence below, as necessary to analyze the issues disputed by the parties.

## IV. ALJ's DECISION

ALJ Ryan found that plaintiff met the insured status requirements for DIB through December 31, 2015. (T. 23, 190). At step one of the sequential disability evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 31, 2010, her alleged onset date. (T. 24). The ALJ next found, at step two, that plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, post-traumatic stress disorder (PTSD), and depressive disorder. (T.

5

24-25).[2]  At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (T. 25-28).

The ALJ next found that plaintiff retained the residual functional capacity to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), which involved the performance of simple tasks.  (T. 28-33).[3]  At step four, the ALJ found that plaintiff was able to perform her past relevant work, from 2004 through 2010, as a sewing machine operator, because that prior work is classified as light, unskilled work in the Dictionary of Occupational Titles.  (T. 33).  Alternatively, at step five, the ALJ used Medical-Vocational Rule 202.16 as a framework for decision-making to conclude that there were a significant number of other jobs in the national economy that plaintiff could perform.  (T. 33-34).[4]  Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the Act.  (T. 34-35).

## V.  ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)  The commissioner erred in weighing the medical evidence with respect to the extent of plaintiff's mental and physical impairments and his decision, particularly with respect to plaintiff's residual functional capacity, was not supported by substantial evidence.  (Pl.'s Brief at 1,5-9).

(2)  The ALJ failed to adequately develop the record at the administrative hearing by, *inter alia*, taking an adversarial posture with respect to

---

[2] The ALJ explained why he concluded that various other medical problems experienced by plaintiff, including her migraine headaches, did not rise to the level of a severe impairment. The ALJ noted that he considered all of plaintiff's impairments, even those that were not deemed severe, in determining her residual functional capacity.  (T. 25).

[3] The details of the ALJ's RFC determination are discussed further below.

[4] The details of the ALJ's analysis at step five is discussed further below.

plaintiff, and improperly evaluated her credibility.  (Pl.'s Brief at 1, 9-10).

Defendant argues that the ALJ properly weighed the competing medical evidence, and that substantial evidence supported the ALJ's RFC determination, as well as his finding that plaintiff was not disabled.   (Def.'s Brief at 6-11).  Defendant contends further that the ALJ properly and fairly evaluated plaintiff's credibility. (Def.'s Brief at 11-13).  For the reasons set forth below, this court finds that the ALJ properly evaluated the medical evidence and that his RFC and disability determinations were supported by substantial evidence.  The court also concludes that the ALJ did not improperly inhibit the plaintiff's testimony at the hearings, and that he appropriately evaluated her credibility.  According, the court recommends that the Commissioner's decision be affirmed and that plaintiff's complaint be dismissed.

## VI.    RFC/MEDICAL EVIDENCE/TREATING PHYSICIAN

The ALJ determined that plaintiff had the RFC to perform "unskilled" light work.  (T. 28).  Plaintiff argues that the ALJ erred in unfairly and selectively evaluating the medical evidence, and in not finding that plaintiff had more substantial mental health and physical limitations.  For the following reasons, this court concludes that the ALJ appropriately evaluated the medical evidence, and that his RFC determination was supported by substantial evidence.

### A.    Legal Standards

#### 1.    RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts,

as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that the report is rejected. *Halloran v. Barnhart*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### B. Analysis

## 1. Plaintiff's Physical Impairments

The ALJ determined that plaintiff had the RFC to perform a range of light work. In particular, the ALJ found that plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for eight hours in an eight-hour workday, and sit for eight hours in an eight-hour workday. (T. 28).

In reaching this RFC determination, the ALJ gave "great weight" to the medical source statement of consultative examiner Kalyani Ganesh, M.D., "due to her programmatic expertise, her physical examination of the claimant, and the consistency of her opinions with the overall evidence."[5] (T. 31). Dr. Ganesh noted that plaintiff complained of neck pain "that comes and goes" and that was aggravated by "activities and moving"; shoulder pain that had been helped by physical therapy; and a history of migraines that had been helped by medication, with no "major attack in a while." (T. 427). Claimant reported that she stopped working mainly because of anxiety and depression, for which she was receiving treatment. (T. 427).

Upon examination, Dr. Ganesh concluded that plaintiff had "no gross limitation" for sitting, standing or walking and a "mild to moderate limitation" with respect to carrying, pushing, and pulling." (T. 430). These conclusions were supported by Dr. Ganesh's medical findings with respect to plaintiff: plaintiff had a normal stance; she

---

[5] *See, e.g., House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 151-52 (N.D.N.Y. 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability), citing, *inter alia, Leach ex rel. Murray v. Barnhart*, No. 02 Civ. 3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")

walked with a normal gait with no assistive device; she could walk on her toes, although not on her heels; she could squat fully; she needed no help changing for the examination or getting on and off the examination table and was able to rise from a chair without difficulty; plaintiff had full cervical flexion, lateral flexion, and rotation, and 25 degree extension; she had no abnormality of the thoracic spine; plaintiff's lumbar spine showed a full range of motion bilaterally and the straight leg raising test was negative bilaterally[6]; plaintiff had a full range of motion in her shoulders, forearms, elbows, wrists, hips, knees, and ankles; her joints were stable and nontender with no redness, heat, swelling, or effusion; a neurological exam indicated that plaintiff's deep tendon reflexes were physiologic and equal in the upper and lower extremities, with no sensory deficit, and she had full strength in her upper and lower extremities; plaintiff showed no significant muscle atrophy or other issues with respect to her extremities; her hand and finger dexterity was intact and her grip strength was normal. (T. 428-29). The ALJ noted that the record included no medical evidence from treating or other sources that rebutted Dr. Ganesh's findings. (T. 31). The ALJ also observed that Dr. Siddiqi consistently opined that claimant had no physical limitations, although the ALJ recognized that Dr. Siddiqi was treating plaintiff for her psychological impairments. (T. 31, 494, 553, 573).

Plaintiff argues that the ALJ failed to give proper weight to the records of treating physicians with respect to plaintiff's migraine headaches and her cervical

---

[6] "The Straight Leg Raising (SLR) test has been used as the primary test to diagnosis lumbar disc herniations . . . ." Majlesi J, Togay H, Unalan H, Toprak S., *The sensitivity and specificity of the Slump and the Straight Leg Raising tests in patients with lumbar disc herniation*, http://www.ncbi.nlm.nih.gov/pubmed/18391677 .

spine impairment, without specifying how these issues would effect her ability to perform light work. (Pl.'s Brief at 8). Plaintiff's counsel cites to a consultation report from March 12, 2013 in which plaintiff reported having a headache "every other day and last[ing] 2 to 3 hours a day." (*Id.*, citing T. 613).[7] However, the same report, created during the time period between plaintiff's two administrative hearings when she was actively pursuing her claim for benefits, also states that she got "good relief" from taking Ibuprofen 600 mg. and used her stronger migraine medication, Imitrex, only twice a month, on average. The report also notes that plaintiff obtained relief from neck and shoulder pain with physical therapy and other conservative treatments such as a heating pad, neck traction, and a TENS unit. (T. 613). Plaintiff notes that she visited the emergency room to address an uncontrolled migraine headache on November 8, 2012. (Pl.'s Brief at 8, citing T. 599-600).

Notwithstanding the couple of examples cited by defendant, the ALJ concluded that the medical evidence indicated that plaintiff's migraine headaches were occasional and were well controlled by medication. (T. 25, 30, citing T. 389, 444 (dup.), 512, 517). Plaintiff's first recorded complaints of migraines occurred in April 2008, when she had a negative CT scan of her head (T. 349, 363), and she continued to work for 18 months thereafter. The medical evidence since plaintiff's alleged onset date provides strong support for the ALJ's finding that her migraines were, with rare exceptions (T. 599-600, 608), well managed by medication and did not significantly impair her ability to perform light work (T. 439, 444, 448, 512, 516, 517, 617, 623, 630, 631). As noted

---

[7] In fact, the report somewhat ambiguously states "She states a headache every other day, average 2 week lasting 2 hours to 3 days." (T. 613).

above, there is also substantial medical evidence in the record supporting the ALJ's conclusion that plaintiff's cervical pain was addressed and controlled with conservative treatment, including physical therapy. (T. 30, citing T. 411, 553, 573, 602-611, 613-615). The court concludes that the ALJ properly weighed the medical evidence regarding plaintiff's physical capabilities, and his finding that plaintiff could meet the physical requirements of light work was supported by substantial evidence.

### 2. Plaintiff's Mental Impairments

The ALJ determined that the plaintiff had the RFC to understand and follow simple instructions and directions, perform simple tasks with supervision and independently, maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule, relate to and interact appropriately with others to the extent necessary to carry out simple tasks, and handle reasonable levels of simple, repetitive work-related stress in that she can make decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the plaintiff to supervise or manage the work of others. (T. 28). The ALJ also concluded that plaintiff's mental limitations did not significantly limit her ability to perform, on a sustained basis, the basic mental demands of unskilled light work. (T. 34).

In making these findings, the ALJ gave "significant weight" to the opinions of medical consultant, Dr. Butensky, "due to his programmatic expertise, his review of the [plaintiff's] medical records, and the consistency of his opinions with the

longitudinal medical evidence in the record." (T. 31).[8]  Based on his review and

analysis of the medical records and opinions of consultative examiner Dr. Shapiro and

plaintiff's treating mental health professionals, including Dr. Siddiqi, Dr. Butensky

concluded, as of August 2011:

> The evidence (with greater weight given to treatment provider . . . over a
> one-time [consultative examiner]) indicates that the [plaintiff] has a moderate
> psychiatric impairment that has been improving with treatment.  She retains the
> capacity to perform simple job tasks; she has mild to moderate limitations in her
> ability to sustain attention/concentration, adapt to changes in a routine work
> setting, and interact appropriately with coworkers and supervisors.

(T. 478).

Although he did not himself examine plaintiff, Dr. Butensky's findings were

largely based on the medical records of plaintiff's primary mental health treatment

providers from January 2011 through the date of Dr. Butensky's August 2011 report.

(T. 418-422, 631).  Dr. Siddiqi started treating plaintiff in May 2011 and diagnosed her

with general anxiety disorder and PTSD.  (T. 420, 422).  Dr. Siddiqi's July 16, 2011

progress notes indicate that plaintiff reported that she was "feeling better as long as she

continues to take her meds."[9]  She also reported that her anxiety and flashbacks were

"less" and that she was able to focus better.  Plaintiff also stated that she was "sleeping

and eating well."  (T. 631).[10]

---

[8] *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (the opinions of non-examining
sources may override treating sources' opinions provided they are supported by substantial
evidence in the record), and the authority cited in note 5 above.

[9] Dr. Siddiqi's progress notes are difficult to decipher in spots because of his often
illegible handwriting.

[10] Dr. Butensky also reviewed the medical records of the mental health professional who
treated plaintiff before Dr. Siddiqi did.  (T. 478).  Licensed Clinical Social Worker Annette

The report of consultative examining psychologist Jeanne A. Shapiro, Ph. D., was considered by Dr. Butensky, who gave it "partial weight" because Dr. Shapiro only examined plaintiff once, and by the ALJ, who gave Dr. Shapiro's opinion "little weight." (T. 32, 478). Dr. Shapiro examined plaintiff, who presented as "tense and apprehensive, sad and tearful" (T. 433), and reached a diagnosis of PTSD and depressive disorder (T. 434).[11] Dr. Shapiro also opined that

> Vocationally, the claimant may have difficulty adequately understanding and following some instructions and directions as well as completing some tasks due to memory and concentration deficits. She may have difficulty interacting appropriately with others due to social withdrawal. Attending work or maintaining a schedule may be difficult due to lack of motivation and lethargy. She does not appropriately manage stress.

(T. 434). Dr. Butensky and the ALJ both noted that Dr. Shapiro's medical source statement regarding plaintiff's expected vocational limitations "due to memory and concentration deficits" were inconsistent with the psychologist's findings, after testing, that plaintiff's "attention and concentration" and "recent and remote memory skills" were "intact." (T. 32, 433, 478). The ALJ's determination that Dr. Shapiro's opinion was "not consistent with the longitudinal medical evidence in the record" (T. 32) is further supported by the records of Dr. Siddiqi's treatment of plaintiff after Dr. Butensky's report in August 2011.

---

Adams reported, on February 24, 2011, that plaintiff was "making some progress," and that she was "able to identify healthy coping skill of shopping, talking to friends, going on the computer, [and painting] as good coping skills." (T. 411).

[11] Dr. Shapiro's diagnosis also included "R/O [rule out] Borderline Intellectual Functioning," despite noting that plaintiff was a high school graduate in regular education and attended business school in Bosnia. (T. 431, 434). The ALJ noted that Dr. Shapiro's rule out diagnosis was "not consistent with any evidence in the record" or with plaintiff's significant work history. (T. 32).

Dr. Siddiqi completed medical source statements for plaintiff in October 2011, January 2012, March 2012, July 2012, and November 2012. (T. 493-497, 527-530, 552-553, 572-573, 578-579 (dup.)). In all but the July 2012 source statement (T. 527-529), Dr. Siddiqi characterized plaintiff's mental impairments or limitations resulting from her PTSD, general anxiety disorder, and/or depressive disorder as no worse than "moderate." In his most recent (November 2012) source statement, Dr. Siddiqi stated that plaintiff's mental health condition had an expected duration of less than one year. He also opined that there was no evidence that plaintiff had limitations with respect to carrying out instructions and making simple decisions, and that plaintiff was "moderately limited" with respect to understanding and remembering instructions, maintaining attention/concentration, interacting appropriately with others, maintaining socially appropriate behavior without exhibiting behavior extremes, and apparent ability to function in a work setting at a consistent pace. (T. 553).

Plaintiff argues that the ALJ erred by "ignor[ing]" Dr. Siddiqi's July 2012 medical source statement, which found, *inter alia*, that plaintiff had "marked" restrictions with respect to interacting appropriately with the public and responding appropriately to usual work situations and to changes in a routine work setting, and between moderate and marked restrictions with respect to the ability to make judgments on simple work-related decisions. (Pl.'s Brief at 8; T. 528-529). However, the ALJ did explicitly discuss Dr. Siddiqi's July 2012 medical source statement, noting that it was inconsistent with Dr. Siddiqi's other medical source statements before and after the July 2012 statement. The ALJ gave "reduced weight" to Dr. Siddiqi's July 2012 RFC evaluations because of the inconsistencies with his other medical source

15

statements, as well as inconsistencies with Dr. Siddiqi's treatment notes and "the overall evidence." (T. 32). Of particular significance, Dr. Siddiqi's progress notes from July 28, 2012–four days after the only medical source statement that included findings of some marked restrictions–stated that plaintiff reported that she was "doing well" and was "able to function OK" and that she "denied mood swings" and had "no trouble sleeping." (T. 623). As the ALJ noted, Dr. Siddiqi's November 3, 2012 treatment notes state that plaintiff reported that her "mood and anxiety-related symptoms are in good control." (T. 32, 621). Dr. Siddiqi's most recent (March 18, 2013) progress notes reflect that plaintiff reported that "she is doing OK as long as she takes her medicine," and that she was sleeping and eating well, that her energy level and motivation are good, and that she had "less" mood swings. (T. 617).

Consulting psychologist Nicole L. Marioni, Ph. D., examined and tested plaintiff for two hours in January 2012 at the behest of plaintiff's appointed representative. (T. 498-508). During the interview, plaintiff's "affect was labile, with her mood fluctuating from very sad and tearful to anxious, to irritable and agitated" and her demeanor ranging from "loud, and tearful, almost to the point of hysteria at times" to "calm and organized" at other times. (T. 502). Plaintiff was "so overwhelmed and distressed during the evaluation that she was unable to understand many of the tasks of the mental status exam and formal psychological testing." (T. 503). Dr. Marioni diagnosed plaintiff with Major Depressive Disorder, PTSD, and Rule out Bipolar Disorder. (T. 503). The psychologist concluded "as a direct result of [plaintiff's] emotional and cognitive problems, her limitations in concentration, acquisition of new information, fluid problem-solving, and abstract reasoning appear to currently interfere

with her ability to successfully consistently perform at various job-related tasks. (T. 503-504). In a medical source statement, Dr. Marioni had "extreme" or "marked" restrictions on all but one of the work-related mental activities listed on the form. (T. 506-507).

Plaintiff argues that the ALJ erred in giving "no weight to the report completed by [Dr. Marioni] because she has no treating relationship with the plaintiff and her opinions are not consistent with the overall evidence." (T. 32; Pl.'s Brief at 7). The ALJ elaborated : "the opinions in the report appear to be based on the reports of the claimant rather than a treating relationship. This psychologist remarked that the claimant's limitations were reportedly present for ten years [(T. 507)], which intersects with a time period that the claimant worked at substantial gainful activity . . . ." (T. 32). Substantial evidence, particularly the contemporaneous and subsequent medical findings of plaintiff's treating psychologist, Dr. Siddiqi,[12] as set forth above, support the ALJ's rejection of Dr. Mariani's extremely restrictive RFC finding.

The court rejects plaintiff's argument that the ALJ erred in "selectively" considering the treatment statements from Dr. Siddiqi and the other medical evidence. Rather, with the assistance of medical consultant, Dr. Butensky, the ALJ appropriately evaluated the conflicting medical evidence. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (genuine conflicts in the medical evidence are for the Commissioner to

---

[12] Dr. Siddiqi's October 2011 and January 2012 medical source statements, which found no greater than moderate limitations on plaintiff's work-related mental activities (T. 493-497), and his progress notes for his two sessions with plaintiff before she met with Dr. Marioni, are inconsistent with Dr. Marioni's bleak prognosis for plaintiff. (T. 626 (12/31/2011–"her anxiety and depression related symptoms are in fair control . . . [H]er energy level is OK)"; T. 627 (11/19/2011–"she is doing well. . . . [H]er mood is OK. She is sleeping and eating well")).

resolve). Although an "ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion," *Rosa v. Callahan,* 168 F.3d at 79, there is no requirement that the ALJ pick one RFC and use that particular evaluation in its entirety. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole). This court concludes that the ALJ's evaluation of the medical evidence was appropriate and that his RFC determination with respect to plaintiff's mental health issues was supported by substantial medical evidence.

## VII. FAIRNESS OF HEARING/CREDIBILITY

Plaintiff contends that the ALJ impeded her testimony and failed to develop the administrative record because of his adversarial posture at the hearings. Plaintiff also argues that the ALJ improperly assessed the credibility of her statements about the severity of her symptoms and limitations, particularly by his consideration of the fact that she obtained a driver's license when she moved to New York. The court concludes that the ALJ did not demonstrate bias or hostility towards plaintiff, nor did he otherwise err, in conducting the administrative hearings. The court further finds that the ALJ's credibility determination was supported by substantial evidence, and that any legal error with respect to the ALJ's consideration of plaintiff's driver's license was harmless.

### A. Legal Standards

#### 1. Conduct of the Administrative Hearing

The ALJ has a duty to "affirmatively develop the record in light of the

essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). According to 20 C.F.R. § 404.940, "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party . . . ." "[W]hen the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate. . . . To determine whether an ALJ exhibited bias against a claimant, courts consider factors such as a clearly manifested bias or inappropriate hostility toward any party, a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party, and a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." *Brown v. Astrue*, No. CV-08-3653, 2010 WL 2606477, at *9 (E.D.N.Y. June 22, 2010) (citations and internal quotations omitted).

## 2. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical

evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.    Analysis

#### 1.    Fairness of the Hearing

Plaintiff's counsel alleges that the ALJ did not adequately develop the record during the two administrative hearings because of his "adversar[ial]" approach to the plaintiff.  Counsel offers two examples.  The first relating to the ALJ's "cross-examin[ation]" of plaintiff at the first hearing about an attempted rape shortly after she arrived in the United States, during which the ALJ allegedly stated that there was

nothing in the record to suggest she had ever previously claimed to be the victim of a sexual assault. (Pl.'s Brief at 9).[13] Secondly, plaintiff argues that the ALJ made an adverse credibility determination based on plaintiff's ability to get an unrestricted driver's license when she moved to New York, but that the ALJ made no effort to follow up on plaintiff's explanation that she was able to obtain a New York license, without taking a driving test, based on the license she had obtained earlier in Missouri. (Pl.'s Brief at 9-10). Based on the hearing transcripts and the ALJ's decision, the court does not agree that the ALJ's conduct at the hearing indicated any bias or hostility towards the plaintiff, or that he did not make appropriate efforts to develop a full record through a fair hearing.

First, it is important to recognize that the plaintiff's behavior, particularly at the first hearing on November 8, 2012, made it extremely difficult for the ALJ or plaintiff's representative to conduct a thorough hearing. The ALJ described plaintiff's conduct during the November 8, 2012 hearing in his decision:

> [T]he [plaintiff] repeatedly got up from her chair and strode around the hearing room, as if in a trance with a fixed stare on her face and extended arms; this behavior is not consistent with any of her medical records. There is no evidence of the [plaintiff] being in a catatonic or hypnotic state in any of her psychological treatment notes.

(T. 27). While the transcript of the November 2012 hearing does not fully reflect

---

[13] Plaintiff's brief adds to the confusion on the issue of plaintiff's prior experience(s) with sexual assault by suggesting that she endured a rape in Bosnia, as well as an attempted rape shortly after she emigrated to Missouri. (Pl.'s Brief at 9). Other than the statement of plaintiff's representative at the first hearing that he "had no knowledge of the allegations of being raped," (T. 77), which appears to be a misinterpretation of plaintiff's prior reference to the attempted rape in Missouri (T. 76), there is nothing this court found in the record to suggest that plaintiff was the victim of a rape in Bosnia.

plaintiff's alleged "bizarre" behavior, the ALJ asked plaintiff to sit down several times, and the plaintiff's representative, who had worked with the plaintiff for four years, appeared to acknowledge that his client's behavior was unprecedented and disruptive.[14] Ultimately the ALJ decided to adjourn the hearing until plaintiff was "in a better condition to answer questions," and plaintiff's representative agreed with the ALJ's decision, and thanked him for his "understanding." (T. 72, 74, 77-79).

After the plaintiff first testified that "somebody tried to rape me," the ALJ asked a few questions that could be characterized as skeptical and insensitive. (T. 76, 78). Subsequent discussion between the ALJ and the plaintiff's representative is a bit unclear, but my read of the ALJ's comments is that he was questioning whether the medical records showed that plaintiff ever engaged in the type of behavior she was displaying in the hearing room, not whether she was truly the victim of a sexual assault. (T. 77-78). Plaintiff's brief cites four references to the attempted rape of plaintiff in Missouri among 325 pages of medical records. (Pl.'s Brief at 9, citing T. 404, 406, 432, 498). It is certainly conceivable that the ALJ did not recall the very scattered references to the sexual assault in the record. In any event, given the fact that the ALJ allowed plaintiff another opportunity to testify in spite of her strange and suspicious behavior, the court cannot conclude that the first administrative hearing in this case was fundamentally unfair.

_____

[14] There is clearly evidence in the medical records of plaintiff reacting with great emotion when discussing her experiences in Bosnia and the subsequent sexual assault, particularly with the consulting psychologists who were preparing reports for the ALJ. (T. 432, 433, 502, 503). However, plaintiff's counsel did not refer the court to any medical evidence indicating that plaintiff had previously demonstrated the behaviors displayed during the administrative hearing.

At the continued hearing on March 28, 2013, plaintiff's "bizarre" behavior continued (T. 21, 46, 54-55), but the plaintiff's representative and the ALJ were able to question plaintiff at greater length, through a translator. (T. 48-58, 63-66). The plaintiff acknowledged a prior ability to read, write, and speak English, but claimed that she was "not able to do anything" in that regard now. (T. 51). The ALJ questioned plaintiff about obtaining her New York driver's license, and she was allowed to testify that she did not drive (T. 51-52) and that, while she did pass a driving test "much earlier," she obtained her New York license without any testing" (T. 54). When plaintiff's representative attempted to question her about her communications with Dr. Siddiqi about the attempted rape in Missouri, she stated that she did talk with her psychiatrist, but then said "I don't want to talk anymore."[15] After plaintiff's representative had the interpreter advise the plaintiff that "if she doesn't talk, . . . we might as well end the hearing now," the representative stated "[t]hat's all I have, your honor[,]" and the ALJ closed the hearing. (T. 65-66).

Perhaps because of plaintiff's traumatic childhood experiences in Bosnia and her cultural background, the administrative hearings did not provide a conducive atmosphere to fully draw her out about her mental health issues. However, there was ample medical evidence in the record that documented plaintiff's position with respect to her medical and mental health limitations. Under all circumstances, including the plaintiff's strange and disruptive behavior, this court cannot conclude that the ALJ displayed bias or hostility towards the plaintiff or that he did not provide the plaintiff

---

[15] The medical records indicate that plaintiff confided in female health care professionals, but not in her male treating psychiatrist, Dr. Siddiqi, about the prior sexual abuse.

and her representative a fair opportunity to develop the administrative record. *See, e.g.*, *Rodriguez v. Astrue*, No. 11 CIV. 7720, 2012 WL 4477244, at *33 (S.D.N.Y. Sept. 28, 2012) (we reject plaintiff's contention that the ALJ demonstrated hostility toward her when he suggested that she had fabricated a history of domestic abuse; the ALJ's questionable inference, that the absence of evidence of treatment of domestic abuse refuted plaintiff's claim of such abuse decades earlier, may be well wide of the mark, but does not itself demonstrate bias or hostility); *Toner v. Schweiker*, 537 F. Supp. 846, 856, 857-58 (W.D.N.Y. 1982) (I cannot conclude that plaintiff was denied a fair administrative hearing by the ALJ's allegedly "excessive" and "adversarial" questioning of plaintiff; the nature of the ALJ's examination was largely a response to plaintiff's own refusal to cooperate).[16]

### 2.    Plaintiff's Credibility

The ALJ, following the appropriate two-step analysis, concluded that plaintiff's statements concerning the intensity, persistence, and limiting effect of [her alleged] symptoms are not fully credible."  (T. 29).  In evaluating plaintiff's credibility, the ALJ noted that

> [w]hile it is conceivable to have the conditions that [plaintiff] alleges and still obtain a drivers' license, it hardly seems probable or believable to do so when, as here, the [plaintiff] alleges that she is totally incapacitated and cannot speak, read, or write in English.  The [plaintiff] testified that she has forgotten how to speak, read, and write in English, so one can only speculate how she managed to obtain a drivers' license shortly after the alleged disability onset date.

(T. 29).  Plaintiff testified that she did not drive, but was able to get her New York

---

[16] *Toner* involved an administrative hearing with respect to a claim for Social Security retirement and Medicare benefits, under different legal standards, but is nonetheless instructive.

license without taking any test, presumably based on having a valid Missouri license at the time she moved to Utica.  (T. 51-52, 54).  The ALJ either overlooked or failed to credit plaintiff's seemingly plausible explanation for how she secured her New York license.  However, while the plaintiff's ability to obtain a driver's license in New York in 2010 may not, by itself, provide significant support for the ALJ's credibility finding, his skepticism about her recent loss of her English language skills was reasonable.  There is significant other evidence in the record reflecting plaintiff's facility in English, well after 2010.  For example, Dr. Marioni noted, in January 2012, that plaintiff "speaks English fairly well, to the degree that a translator was not needed for the evaluation."  (T. 499).

However, even if the ALJ's reliance on plaintiff's driver's license in judging her credibility was in error, the ALJ cited extensive additional evidentiary support for his credibility finding.  For example, the ALJ's observation that the plaintiff's bizarre conduct at the hearings was not consistent with any behaviors reflected in her medical records provided a significant basis for questioning the credibility of her testimony.  The ALJ's analysis of the medical evidence and his RFC finding, which this court has determined was supported by substantial evidence, undermine the credibility of the plaintiff's statements about the greater severity of her medical and mental health symptoms and limitations.  (*See, e.g.*, T. 26-27, 30-31).  The ALJ also cited evidence of plaintiff's involvement in various activities of daily living, such as walking with her family, playing with her son, shopping, talking with friends, and drawing or painting, which contradicted her claims about substantially greater mental-health-related limitations in that area.  (T. 26-27, citing, *inter alia*, T. 411, 434).  The court concludes

that the ALJ's credibility determination was supported by substantial evidence[17] and any error involving the ALJ's consideration of how plaintiff obtained her New York driver's license was harmless error.[18]

## VIII. <u>STEP FOUR AND STEP FIVE DISABILITY DETERMINATION</u>

Plaintiff did not explicitly raise any issues with the ALJ's disability determinations at steps four and five, other than her contention that the ALJ improperly evaluated the medical evidence and plaintiff's credibility, and underestimated the extent of her physical and mental limitations in his RFC determination. Counsel for the Commissioner nonetheless addressed why the ALJ's findings at steps four and five were also supported by substantial evidence. (Def.'s Brf. at 14-16). Having determined that the ALJ properly assessed the medical evidence, and that his credibility and RFC determinations were supported by substantial evidence, the court finds no issues with the ALJ's determinations at step four and five. In the exercise of an abundance of caution, the court will explain why the ALJ's ultimate disability determination was supported by substantial evidence.

### A. Step Four

---

[17] *See, Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

[18] *See e.g,, Buscemi v. Colvin*, No. 13-CV-6088, 2014 WL 4772567, at *17 (W.D.N.Y. Sept. 24, 2014) (ALJ's error in analyzing credibility is harmless when there is substantial evidence supporting the remainder of the credibility analysis); *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp. 2d 67, 82 n.26 (N.D.N.Y. 2005) (ALJ's misstatement of plaintiff's daily activities was harmless error where the credibility assessment is amply supported by other substantial evidence) (citations omitted)). *See also Rodriguez v. Astrue*, 2012 WL 4477244, at *33 (The ALJ's decision does not demonstrate animus simply because one of the stated bases of his credibility assessment may have been unjustified).

As noted above, at step four, the ALJ found that plaintiff was able to perform her past relevant work, from 2004 through 2010, as a sewing machine operator, because that prior work is classified as light, unskilled work in the Dictionary of Occupational Titles. (T. 33). Having concluded that the ALJ's RFC determination was supported by substantial evidence, the ALJ's finding that the plaintiff was able to perform her past relevant work and that, therefore, she was not disabled, is also supported by substantial evidence. See, e.g., *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (although there was some conflicting medical evidence, the ALJ's determination that plaintiff could perform her previous unskilled work was well supported notwithstanding the fact that some clinicians who examined her found that she had some moderate limitations in her work-related mental functioning).

## B.    Step Five

Notwithstanding his finding that plaintiff was not disabled at step four, the ALJ, in the alternative, proceeded to step five of the disability analysis. The ALJ, without consulting with a vocational expert, used Medical-Vocational Rule 202.16 as a framework for decision-making to conclude that there were a significant number of other jobs in the national economy that plaintiff could perform. (T. 33-34).

### 1.    Applicable Law

At step five, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional

impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE"). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

*Kocaj v. Apfel*, No. 97 CIV. 5049, 1999 WL 461776, at *7 (S.D.N.Y. July 6, 1999) (citations omitted), provides a cogent summary of the law relating to Medical-Vocational Rule 202.16. 20 C.F.R. § 404.1569; 20 C.F.R. pt. 404, subpt. P, app. 2, table no. 2, rule 202.16:

> These guidelines consist of a matrix of four factors–physical ability, age, education, and work experience–that are used to determine whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. . . . The medical-vocational guidelines were developed as an alternative to relying on the testimony of vocational experts, who were often inconsistent with respect to similarly situated claimants. . . . "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform ." . . . "If such work exists, the claimant is not considered disabled." . . . The guidelines provide that a significant number of jobs exist for a person who can perform light work, is 49 years old or younger, is illiterate or unable to communicate in English, and whose previous work has been unskilled.

*Id.* (citing, *inter alia*, *Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983)).

The ALJ found that plaintiff, age 28 on her alleged disability onset date of October 31, 2010, was a "younger individual." (T. 33, 73 (citing 20 C.F.R. §§ 404.1563, 416.963)). Because plaintiff claimed that she had difficulty communicating in English, the ALJ stated that he would give her the benefit of the doubt and consider her as if she was illiterate in English. (T. 33 (citing 20 C.F.R. §§ 404.1564, 416.964)).[19] The ALJ also found that the transferability of skills was not material

---

[19] As noted above, there was considerable evidence in the record that plaintiff's English was adequate.

because plaintiff s past relevant work was unskilled.  (T. 33). These factual findings, together with a finding that plaintiff had the residual functional capacity for light work, would direct a finding that plaintiff was not disabled under Medical- Vocational Rule 201.16.  20 C.F.R. Part 404, Subpart P, Appendix 2.  *See, e.g.*, *Kocaj v. Apfel*, 1999 WL 461776, at *7 (because plaintiff fit into all of the categories of Rule 202.16 as of the date she was last insured for disability benefits, the ALJ properly determined that she was not disabled); *Duran v. Colvin*, No. 14 CIV. 4681, 2015 WL 4476165, at *16 (S.D.N.Y. July 22, 2015) (plaintiff is a "younger" individual, illiterate or unable to communicate in English who has unskilled work experience; because plaintiff has the residual functional capacity to perform the full range of light work, a finding of not disabled would be directed by Medical-Vocational Rule 202.16); *Lora v. Massanari*, No. 00CIV. 8958, 2002 WL 655208, at *7 (S.D.N.Y. Apr. 18, 2002).

The ALJ found that plaintiff's non-exertional limitations did not significantly limit her ability to perform, on a sustained basis, the basic mental demands of unskilled light work–to carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  (T. 34 (citing SSR 85-15, 1985 WL 56857)).  There is substantial evidence to support this finding based on the court's prior conclusions with respect to the ALJ's RFC determination, and the finding allowed the ALJ to proceed at step five without input from a vocational expert.  See, e.g., *Zabala v. Astrue*, 595 F.3d at 410-11 (although there was some conflicting medical evidence and some clinicians found that plaintiff had some moderate limitations in her work-related mental functioning, the ALJ appropriately found that plaintiff's mental condition did not limit

her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision; thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ properly used the Medical-Vocational Guidelines, without consulting a vocational expert, to find there was work in the national economy that plaintiff could perform); *Cheek v. Comm'r of Soc. Sec.*, No. 5:14-CV-482, 2015 WL 3857253 (TJM/ATB), at *12, 15 (N.D.N.Y. June 22, 2015) (the ALJ's finding that plaintiff possessed the ability to perform the basic mental demands of competitive unskilled work was supported by the psychological evidence, which included opinions that plaintiff had some moderate limitations in work-related mental activities; the ALJ's finding that the occupational base of light work was not significantly eroded, and that the use of a VE was not required, was supported by substantial evidence); *Sipe v. Astrue*, 873 F. Supp. 2d 471, 480-81 (N.D.N.Y. 2012) (the conclusions of medical sources who found that plaintiff had mild or moderate limitations in work-related mental activities provided substantial support for the ALJ's finding that, under Social Security Regulation 85-15, plaintiff's ability to perform unskilled work was not significantly diminished and, therefore, that the hearing officer was not required to consult a vocational expert at step five); *Roach v. Colvin*, No. 5:12-CV-992 (GLS/ATB), 2013 WL 5464748, at *15-17 (N.D.N.Y. Sept. 30, 2013).

As noted above, one of the requirements of Vocational Rule 201.16 is that plaintiff had the RFC to perform light work. Having appropriately concluded that plaintiff's ability to perform unskilled light work was not significantly reduced by her mental impairments, the ALJ also properly found that there were a significant number

of other jobs in the national economy that plaintiff could perform, using Vocational Rule 201.16 as a framework. *See, e.g.*, *House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 156 (N.D.N.Y. 2012) (the ALJ found that plaintiff's non-exertional impairments had little to no effect on her occupational base of unskilled sedentary and light work; accordingly, the ALJ properly used the Medical-Vocational Rules as a framework to find that plaintiff not disabled).

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 19, 2016

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

31